Steven SHOLLY and Donald E. Hossler, Petitioners,

v.

UNITED STATES NUCLEAR REGULATORY COMMISSION et al. and United States of America, Respondents,

Metropolitan Edison Company et al., Intervenors.

PEOPLE AGAINST NUCLEAR ENERGY, Petitioner,

v.

UNITED STATES NUCLEAR REGULATORY COMMISSION; John Ahearne, Victor Gilinsky, Richard T. Kennedy, Joseph M. Hendrie, and Peter A. Bradford, in Their Individual Capacities; and the United States of America, Respondents,

Metropolitan Edison Company, Jersey Power & Light Company, and Pennsylvania Electric Company, Intervenors.

In Re PEOPLE AGAINST NUCLEAR ENERGY, Petitioner.

Nos. 80–1691, 80–1783 and 80–1784.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1980.

Decided Nov. 19, 1980.

Certiorari Granted May 26, 1981.
See 101 S.Ct. 3004.

Robert Hager, Washington, D. C., with whom Daniel P. Sheehan, Washington, D. C., was on brief, for petitioners.

Stephen F. Eilperin, Sol., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom E. Leo Slaggie, Atty., U. S. Nuclear Regulatory Commission, was on brief, for respondent United States Nuclear Regulatory Commission.

David A. Strauss, Atty., Dept. of Justice, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., and Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D. C., were on brief, for respondent United States of America. Stanford Sagalkin and Lois Schiffer, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent United States of America.

Mark Augenblick, Washington, D. C., with whom George F. Trowbridge and Matias F. Travieso-Diaz, Washington, D. C., were on brief, for intervenors. Robert E. Zahler, Washington, D. C., also entered an appearance for intervenors.

Before WRIGHT, Chief Judge, and MIKVA and EDWARDS, Circuit Judges.

Opinion *PER CURIAM*.

PER CURIAM:

In this case petitioners seek review of two orders by the Nuclear Regulatory Commission (NRC) permitting the Metropolitan Edison Company to release radioactive gas into the atmosphere from the Three Mile Island nuclear plant.[1] The claim here is that the orders issued by the NRC were made effective without affording petitioners their statutory rights to notice and a hearing.[2]

---

1. Metropolitan Edison Co., Pennsylvania Electric Co., and Jersey Central Power and Light Co. jointly hold the operating license to the Three Mile Island nuclear plant. In this opinion they are called collectively either "the licensee" or "Metropolitan Edison."

2. The petitioners primarily rely on § 189(a) of the Atomic Energy Act of 1954, 42 U.S.C. § 2239(a) (1976), as amended in 1957, Pub.L. No.85-256, § 7, 71 Stat. 579 (1957), and in 1962, Pub.L.No.87-615, § 2, 76 Stat. 409 (1962). Section 189(a) reads in pertinent part as follows:

In any proceeding, under this chapter, for the granting, suspending, revoking, or amending of any license ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application ... for a construction permit for a facility .... [T]he Commission may, in the absence of a request therefor by any person whose interest may be affected, issue ... an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for ... an amendment to an operating license upon a determi-

On June 26, 1980, this court denied petitioners' request for emergency injunctive relief to block the release of the radioactive gas. Now that the radioactive gas from the nuclear plant has been fully vented into the atmosphere, the petitioners seek only declaratory relief from this court.

## I. BACKGROUND

This case arises in the aftermath of a widely publicized accident that occurred on March 28, 1979 at "Unit 2" of the Three Mile Island nuclear plant. As a result of the accident, dangerous concentrations of radioactive gas collected in the reactor containment building, inhibiting cleanup and maintenance work.

Three months after the accident, the NRC issued an "Order for Modification of License," 44 Fed.Reg. 45,271 (1979), suspending Metropolitan Edison's authority to operate Unit 2 of the Three Mile Island plant (TMI–2), and requiring it to "maintain the facility in a shutdown condition." Id.[3] The NRC order indicated that, in about thirty days, the Commission would issue a "Safety Evaluation" addressing "the imposition of new and/or revised Technical Specifications setting forth appropriate license conditions." Id.

In fact, the NRC issued no such evaluation. Instead, on November 21, 1979, the NRC issued a "Statement of Policy and Notice of Intent to Prepare a Programmatic Environmental Impact Statement," 44 Fed.Reg. 67,738 (1979), which was to be an "overall study of the decontamination and disposal process." Id. The NRC Statement of Policy directed the agency's staff

to include in the programmatic environmental impact statement on the decontamination and disposal of TMI–2 wastes an overall description of the planned activities and a schedule for their completion along with a discussion of alternatives considered and the rationale for choices made.

Id.

On February 11, 1980, the NRC issued another order, 45 Fed.Reg. 11,282 (1980), which stated that

the facility's operating license should be modified so as to: ... (3) Prohibit venting or purging or other treatment of the reactor building atmosphere ... until each of these activities has been approved by the NRC, consistent with the Commission's Statement of Policy and Notice of Intent to Prepare a Programmatic Environmental Impact Statement.

Id.[4]

Six weeks later the NRC published a notice of the "Availability of Environmental Assessment for Decontamination of the Three Mile Island Unit 2 Reactor Building Atmosphere," 45 Fed.Reg. 20,265 (1980). The notice stated that the Assessment "considers five alternative methods for decontaminating the reactor building atmosphere and recommends that the building atmosphere be decontaminated by purging to the environment through the building's hydrogen control system." Id.[5] The NRC staff

nation by the Commission that the amendment involves no significant hazards consideration.

**3.** Much of the factual basis for the NRC's actions is contained in its report, the "Final Environmental Assessment for Decontamination of the Three Mile Island Unit 2 Reactor Building Atmosphere" (May 1980), which is reprinted in the Intervenor-Respondents' Appendix (App.) 18.

**4.** The February 11, 1980 order specified that any interested person or the licensee could request a hearing before March 21, 1980 on whether the proposed changes in the technical specifications would be sufficient "to protect health and safety or to minimize danger to life and property" or "whether the provisions of this Order would significantly affect the quality of the human environment." Id. at 11,283. The order also provided, however, that a request for a hearing on part (3) of the order would not stay the effectiveness of the order. Id.

**5.** The NRC desired to remove the radioactive gas from the reactor building so that workers could begin to clean the building, maintain the equipment, and prepare to remove the damaged fuel from the reactor core. Removing the radioactive gas from the reactor containment building was only the first step in an extensive cleanup.

concluded in the Assessment that venting the gas into the atmosphere would "not constitute a significant environmental impact and, accordingly, the staff does not propose to prepare a separate Environmental Impact Statement on this action." *Id.* at 20,265–66. Public comments on the Assessment originally were due by April 11, 1980, but the period was extended to May 16, 1980. 45 Fed.Reg. 30,760 (1980).

In May of 1980, the NRC issued the "Final Environmental Assessment for Decontamination of the Three Mile Island Unit 2 Reactor Building Atmosphere." On June 12, 1980, the NRC issued without a hearing two final orders, entitled "Order for Temporary Modification of License," 45 Fed. Reg. 41,251 (1980), and "Memorandum and Order," 2 Nuclear Reg.Rep. (CCH) ¶ 30,498.-01 (1980). The first order modified the operating license[6] to permit the licensee to release the radioactive gas from the reactor building at a faster rate than the existing specifications allowed.[7] The first order also expressly stated that, because the NRC had found that the modification of the operating license involved "no significant hazards consideration," requests for a hearing would not stay the implementation of the order. 45 Fed.Reg. at 41, 252.[8] The second order authorized release of radioactive gas from the reactor building.[9] Venting was to begin on June 22.[10]

On June 16, petitioners wrote a letter to the NRC requesting that it reconsider its finding of "no significant hazards consideration" and its decision to make the June 12 orders effective immediately. The NRC did not respond.

On June 23, petitioners filed a petition in this court for review of the two June 12 orders.[11] Three days later this court denied the petitioners' requests for emergency injunctive and declaratory relief. The next day, one day before the venting began, the petitioners filed a request for a hearing with the NRC on the two June 12 orders. The hearing request was referred to an Atomic Safety and Licensing Board. On July 3, one of the petitioners in No. 1691 moved the Board to suspend the venting; however, this request was subsequently withdrawn, on July 8, shortly before the venting was completed.

Metropolitan Edison began to vent the reactor building on June 28, 1980, at a rate that was within the original license specifications for a normally operating reactor. On July 8, the licensee began to vent the radioactive gas at a faster rate, pursuant to the specifications set in the June 12 license amendment. The venting was completed on July 11. As the NRC had anticipated, the off-site doses from the venting were below the limits set in the June 12 radiation

6. As part of its argument, the NRC contends that the second order, permitting purging, was not a license amendment. However, the NRC admits that the first order amended the TMI–2 operating license.

7. Before the accident of March 28, 1979, the TMI–2 operating license authorized periodic release of specified amounts of radioactive gas into the atmosphere as a normal and necessary part of plant operations.

8. Part of the basis for the Commission's determination of "no significant hazards consideration" was its conclusion that, although existing *release* rate limits would be exceeded, off-site dose limits would not be breached. Since the NRC's concern was the effect of the venting on human health, the Commission felt that the more direct measure—off-site dose limits—would provide a satisfactory standard to determine the appropriate limits on the venting of the radioactive gas.

9. The NRC made no finding that this order involved "no significant hazards consideration." *See* Brief for Respondent Nuclear Regulatory Commission at 30, 35.

10. By making the orders effective immediately, the Commission failed to give any notice in the Federal Register of the license amendment. The Commission contends that so long as it makes a finding of "no significant hazards consideration," the governing statute does not impose such a notice requirement. *See* note 2 *supra* for statutory notice and hearing requirements.

11. On July 8, 1980, a petition for review (No. 80–1783) and an accompanying petition for writ of mandamus (No. 80–1784) were filed in the Third Circuit. On the NRC's motion, those cases were transferred to this court and consolidated for review with No. 80–1691, the case originally filed in this court.

license amendment. In its draft Programmatic Environmental Impact Statement, NUREG–0683, issued August 14, 1980, the Commission stated that it did not anticipate a recurrence of the purging of the reactor building atmosphere, but that some minor releases of gas might be necessary for data gathering purposes. *See* Brief for Respondent Nuclear Regulatory Commission at 6 n.4 & 20 n.11.

## II. MOOTNESS

■ Because the licensee has completed the venting of the reactor containment building, and because both of the June 12 orders have expired, the Commission and the licensee claim that petitioners' claims for injunctive and declaratory relief are moot.[12] However, because we find that these cases are "capable of repetition, yet evading review,"[13] we hold that the petitioners' claims are justiciable in this court.[14]

The mootness doctrine is primarily based on article III of the United States Constitution, which limits federal court jurisdiction to "cases" or "controversies." Courts have interpreted the constitutional provision to limit their jurisdiction to "a present, live

controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969). The case or controversy requirement "preserves the separation of powers" and " 'limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.' " *Tennessee Gas Pipeline Co. v. Federal Power Comm'n,* 606 F.2d 1373, 1379 (D.C.Cir.1979) (quoting *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968)).

Cases arising from agency action, no less than cases involving only private parties, are subject to the mootness doctrine. Yet, as this court has recently noted, "the concept of mootness is placed under some strain in the context of administrative orders whose formal legal effect is typically shortlived." *Tennessee Gas Pipeline Co. v. Federal Power Comm'n,* 606 F.2d at 1379–80. The strain is relieved somewhat by an exception first articulated in *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed.

12. Metropolitan Edison seems to argue that since petitioners' claims for injunctive relief are moot (i. e., the reactor building atmosphere has been purged), the case should be dismissed. This argument, however, misstates the nature of the relief sought by petitioners. They have sought *both* injunctive and declaratory relief in this action. Although petitioners cannot now obtain injunctive relief to prevent the purging, they continue to pursue their claim for a declaratory judgment that the NRC must grant them statutorily mandated notice and a hearing whenever it amends a license. *See, e. g., Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (the Court found that even though the strike had been settled, mooting injunctive relief, the petitioner alleged sufficient facts in support of declaratory relief so that the case should not be dismissed as moot).

13. *See Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

14. We note that the United States has taken the position that the petitioners' claims are "capable of repetition"—since the Commission has stated that it will continue to deny requested hearings when it finds no significant hazards

considerations are involved—but that future claims will not evade review—since "there is no reason to believe that [NRC] actions will characteristically be irreversible." Memorandum of Respondent United States at 4. Consequently, the United States also argues that the petitions should be dismissed as moot.

We reject the Government's position for two reasons. First, as we explain in the text of the opinion, many NRC license amendments are irreversible. The facts in the present case illustrate how making an amendment effective immediately can preclude complete judicial review. Second, we believe that it is unreasonable for the Government to take the position that, in order to seek judicial review of a license amendment, a petitioner must race to the courthouse before the NRC takes an irreversible action. Even if a petitioner could file the petition before the NRC acted, a court more often than not will decline to grant emergency relief. Indeed, such a request for emergency relief was denied in this case. Consequently, because a petitioner will not receive complete judicial review of his claim, even though it might be meritorious, we find that these claims evade review.

310 (1911), where the Supreme Court held that technically moot cases are justiciable if they involve "short term orders, capable of repetition, yet evading review." *Id.* at 515, 31 S.Ct. at 283.

■ A case is considered justiciable if "the litigant show[s] the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 125–26, 94 S.Ct. 1694, 1699–1700, 40 L.Ed.2d 1 (1974). As this case demonstrates, administrative orders, like labor disputes, often "do not last long enough for complete judicial review of the controversies they engender . . . . The judiciary must not close the door to the resolution of the important questions these concrete disputes present." *Id.* at 126–27, 94 S.Ct. at 1700–1701. Yet, in order to invoke the *Southern Pacific* exception, the petitioner must not only show that "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration," he must also show that "there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975).

The issue in the present case is not simply whether the NRC will again purge the reactor building atmosphere without first giving notice and holding a hearing. At stake is whether the NRC will continue its policy of making immediately effective license amendments without holding a hearing, even though petitioners request one, whenever the NRC finds that the amendment involves "no significant hazards consideration."

Under this view of the issues in this case, the conditions for avoiding dismissal on grounds of mootness, set forth in *Weinstein,* are met. The Commission has candidly conceded that

at some point in the TMI–2 cleanup, perhaps on more than one occasion, the Commission will amend the utility's license in respects so minor that the Commission will think itself justified in making the amendment immediately effective based upon a no significant hazards consideration finding. Certainly, that kind of finding has been utilized in the past.

Brief for Respondent Nuclear Regulatory Commission at 23.[15] The Commission plainly intends to adhere to its policy of denying a hearing on a license amendment, under certain circumstances, even though interested parties specifically request a hearing. The chances of recurrence are more than speculative; because the NRC policy will be carried out during the TMI–2 cleanup, there is a "reasonable expectation that the same complaining part[ies]" will be denied their alleged statutory rights to hearing and notice.

As the present case demonstrates, challenges to the NRC's policy of denying a hearing on license amendments may well escape review. The difficulty here is that the orders are often shortlived and the NRC actions, like venting, may be irreversible. The difficulty is compounded when the NRC elects, as in this case, to make its orders effective immediately. These considerations indicate that future challenges to the NRC policy may easily "evade review."

---

15. This admission entirely undercuts Metropolitan Edison's argument that there is no evidence that the actions complained of will be repeated. In each of the cases cited in Metropolitan Edison's brief, the challenged governmental activity had ceased with no indication that it would be continued at a later time. *See, e. g., Murphy v. Benson,* 270 F.2d 419 (2d Cir. 1959), *cert. denied,* 362 U.S. 929, 80 S.Ct. 750, 4 L.Ed.2d 747 (1960). In the present case, by contrast, the NRC has clearly stated its intention to continue with its allegedly unlawful conduct—making certain license amendments effective immediately without holding a requested hearing or giving notice. We think it obvious that the NRC will also continue to rely on the second method employed in this case for avoiding the notice and hearing requirements of § 189(a)—describing an order as something other than a license amendment. *See* note 6 *supra.* The Commission's continued belief in its authority to follow this policy makes petitioners' challenge to the policy "capable of repetition." *See Nader v. Volpe,* 475 F.2d 916 (D.C.Cir.1973).

This court has stated that "[t]he situations [involving appellate consideration of recurrent controversies] are necessarily variant, and the variables complex.... [T]he court's decision to maintain the appeal, in the interest of sound judicial administration, is dependent on a prediction of a recurrence or continuation of what is perceived to be essentially the same legal dispute." *Alton & Southern Railway Co. v. International Ass'n of Machinists & Aerospace Workers*, 463 F.2d 872, 879 (D.C.Cir. 1972). "While an 'effective remedy' for the immediate dispute is not obligatory, there must be at least a capacity for a declaration of legal right concerning a future projection of the actual dispute that precipitated the litigation." *Id.* at 879–80. In the present case, that capacity exists, and we hold that this case is not moot.

## III. THE ORDER FOR TEMPORARY MODIFICATION OF LICENSE

The NRC issued without a hearing the "Order for Temporary Modification of License" (OTML) of June 12, 1980, which substituted off-site dosage limits for release limits in the TMI–2 operating license. The petitioners contend that the NRC's failure to provide a hearing violated section 189(a) of the Atomic Energy Act of 1954. The first sentence of that section provides in relevant part:

> In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.

The NRC and Metropolitan Edison do not dispute that the OTML constituted a license amendment subject to the terms of section 189(a). They do maintain, however, that under the fourth sentence of the section the Commission could dispense with a hearing. The fourth (and last) sentence of section 189(a) reads:

> The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.

The NRC and the licensee argue that the NRC properly made a finding of "no significant hazards consideration" with respect to the OTML, and that consequently a hearing was not required. Although the last sentence of section 189(a) only explicitly "dispense[s] with ... thirty days' notice and publication" upon a determination of "no significant hazards consideration," the NRC and the licensee contend that such a determination also permits the Commission to dispense with a hearing because notice and a hearing are inextricable.[16]

We are convinced that such a finding did not permit the NRC to dispense with a hearing that is otherwise required by section 189(a).[17] This is not the first case in this circuit in which it has been argued that a finding of "no significant hazards consideration" permits the NRC to issue a license amendment without a hearing. In *Brooks*

---

**16.** The petitioners, challenging the correctness of the "no significant hazards consideration" determination, also contend that the NRC was required under the third sentence of § 189(a) to provide 30 days' notice and publication in the Federal Register of the Commission's intent to issue the license amendment without a hearing. The third sentence provides that

> the Commission may, *in the absence of a request therefor* by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty

days' notice and publication once in the Federal Register of its intent to do so.

(Emphasis added.) Since, however, we hold that the petitioners requested a hearing, *see* note 25 *infra*, and that the NRC was required to hold a hearing, we need not reach the question whether the Commission was required to provide 30 days' notice of its intent to issue the license amendment without a hearing.

**17.** It is noteworthy that respondent United States concedes—indeed · argues—that the NRC's failure to provide a hearing violated § 189(a) of the Atomic Energy Act. *See* Memorandum of Respondent United States at 4–21.

*v. Atomic Energy Comm'n*, 476 F.2d 924, 926 (D.C.Cir.1973) (*per curiam*) this court soundly rejected the contention that the fourth sentence in section 189(a) "indicate[d] Congressional intent to dispense with hearings in construction permit amendment proceedings ... when the Commission determines that the amendment involves 'no significant hazards consideration.'" Instead this court, after an examination of the legislative history of section 189(a), held that the fourth sentence only dispenses with requirements of notice and publication. Because this circuit has previously rejected the very construction of section 189(a) offered by the NRC and the licensee,[18] the doctrine of *stare decisis* compels us to hold that the NRC improperly failed to provide a hearing in the instant case.

Moreover, even if this court were not bound by *stare decisis*, we would still adopt the *Brooks* interpretation of the last sentence of section 189(a). The plain language of section 189(a) dispels any notion that by a finding of "no significant hazards consideration" the NRC may dispense with the hearing requirement. The fourth sentence makes no mention of the hearing requirement's being lessened, but makes reference only to the requirements of notice and publication. Despite the plain, unambiguous language contained in the last sentence, the NRC and Metropolitan Edison suggest that the requirements of hearing and notice are so intertwined that the reference to notice in the fourth sentence must also comprehend a hearing. While it is true that requirements of notice and hearing are interrelated, it is clear that Congress was not merging them in section 189(a). That is demonstrated by the third sentence of the section where Congress made explicit reference to the hearing requirement.[19] That sentence plainly demonstrates that Congress did indeed intend to disentangle the two requirements of notice and hearing,[20] and "to lessen the mandatory hearing requirement only when there was no request for a hearing." *Brooks v. Atomic Energy Comm'n*, 476 F.2d at 927.

A review of the legislative history of the 1962 amendments to section 189(a)—by which the last two sentences of the section were added—also firmly persuades us that the *Brooks* court properly construed the last sentence of section 189(a). That history demonstrates that the 1962 amendments to section 189(a) had their origin in congressional concern over a hearing requirement

---

**18.** It is true, of course, that 15 months after the *Brooks* decision this court stated in dictum in a footnote that "[a]n amendment can be made without opportunity for a hearing if the AEC determines that it 'involves no significant hazards consideration.'" *Union of Concerned Scientists v. Atomic Energy Comm'n*, 499 F.2d 1069, 1084 n.36 (D.C.Cir.1974). The court provided no support for its far-reaching statement, nor did it even make mention of the recently decided *Brooks* case, which had squarely *held* to the contrary on the basis of the legislative history of.§ 189(a). We accordingly decline to place any reliance on the dictum in *Union of Concerned Scientists*.

**19.** For the text of the third sentence, *see* note 16 *supra*.

**20.** We are cognizant of the fact that the plain meaning of the third and fourth sentences of § 189(a), when read together, produces in theory a somewhat paradoxical result. Under the fourth sentence the NRC may issue a license amendment without providing 30 days' notice and publication in the Federal Register of its intent to do so, while under the third sentence the NRC need not provide a hearing when one has not been requested. As the NRC and the licensee note, it is difficult to imagine how a hearing can be requested when the NRC issues a license amendment without notice. This "paradoxical result" did not occur, however, in the instant case. Although petitioners did not formally request a hearing prior to issuance of the OTML, their prior expressions of interest constituted in effect a request for a hearing. *See* note 25 *infra*. It is also unclear whether the "paradoxical result" will ever in fact occur. As the NRC conceded at oral argument, there may be some type of notice requirement—al-.though ·perhaps not 30 days' notice and publication in the Federal Register—implicit in the opportunity to seek judicial review of determinations of "no significant hazards consideration." Moreover, our decision today does not reach the question whether some notice of the NRC's intention to amend a license is required under the due process clause of the Fifth Amendment or the Administrative Procedure Act notwithstanding a finding of "no significant hazards consideration."

in *uncontested* cases—that is, when a hearing had not been requested.[21] Representative of that concern was the statement by Raoul Berger, serving as an American Bar Association spokesperson, that

> 14 out of 15 of [the Atomic Energy Commission's] cases have been uncontested. And the central problem appears to be whether trial-type proceedings should be employed under sections 7 and 8 of the Administrative Procedures [*sic*] Act *in uncontested cases* ....

AEC Regulatory Problems: Hearings on H.R. 12336 and S. 3491 Before the Subcomm. on Legislation of the Joint Comm. on Atomic Energy, 87th Cong., 2d Sess. 64 (1962) (statement of Raoul Berger) (emphasis added).[22] *Accord, e. g., id.* at 32 (statement of Herzel H. E. Plaine, Chairman, Special Comm. on Atomic Energy Law, ABA). Thus an interpretation of section 189(a) that would permit the NRC to issue a *contested* license amendment without a hearing would enlarge section 189(a) beyond the scope originally intended.[23]

The 1962 Report of the Joint Committee on Atomic Energy also suggests that Congress perceived the changes to section 189(a) as permitting the NRC to dispense only with notice and publication—not a hearing—upon a finding of "no significant hazards consideration":

> *In the absence of a request for a hearing,* issuance of an amendment to a construction permit, or issuance of an operating license, or an amendment to an operating license, would be possible without formal proceedings, but on the public record ....
>
> ....
>
> Finally, it is expected that *the authority given AEC to dispense with notice and publication* would be exercised with great care and only in those instances where the application presented no significant hazards consideration.

H.R.Rep.No.1966, 87th Cong., 2d Sess. 8 (1962), U.S.Code Cong. & Admin.News 1962, pp. 2207, 2214, S.Rep.No.1677, 87th Cong., 2d Sess. 8 (1962), U.S.Code Cong. & Admin. News 1962, pp. 2207, 2214 (emphasis added). And in a committee hearing one year prior, the Joint Committee on Atomic Energy had noted:

> When no substantial safety question is involved in ... the amendment ... the public interest would be protected by ... publication of an apt notice in the Federal Register [24] and the giving of *an oppor-*

---

**21.** Indeed, counsel for Metropolitan Edison testified in 1961 before the Joint Committee on Atomic Energy and argued for retention of a hearing requirement when a hearing has been requested:

> I hope that this committee will seriously consider repeal of the mandatory hearing requirements of section 189(a), leaving intact, of course, the provisions for a hearing at the request of any person whose interest may be affected by the licensing proceedings.

Radiation Safety and Regulation: Hearings Before the Joint Comm. on Atomic Energy, 87th Cong., 1st Sess. 266 (1961) (testimony of George F. Trowbridge).

**22.** In response the staff counsel to the Joint Committee noted:

> Mr. Berger, I think you are absolutely correct that the difficulty, the background that led to the Joint Committee study and the bills, was the concern over the handling by AEC of uncontested cases ....

AEC Regulatory Problems: Hearings on H.R. 12336 and S. 3491 Before the Subcomm. on Legislation of the Joint Comm. on Atomic Energy, 87th Cong., 2d Sess. 70 (1962) (remarks of David Toll).

**23.** In support of its interpretation of § 189(a) the NRC quotes from a letter written in 1961 by former AEC Commissioner L. K. Olson to the Joint Committee on Atomic Energy, *reprinted in* Staff of the Joint Comm. on Atomic Energy, 87th Cong., 1st Sess., Improving the Regulatory Process, Vol. II, at 578–87 (Comm. Print 1961). The quoted portions of the letter suggest, in ambiguous terms, that the Commissioner was of the view that the AEC should be able to dispense with hearings on license amendments upon a finding that "no substantial new safety questions" are presented. *See* Reply Brief for Respondent Nuclear Regulatory Commission at 9. Even if Commissioner Olson intended his comments to apply to *contested* matters, it is clear from the rest of the legislative history that *Congress* did not share the Commissioner's view.

**24.** It is not entirely clear what the Committee meant by the phrase "publication of an apt notice in the Federal Register." Presumably it only refers to publication of the amendment *after the Commission has issued it.* This is not inconsistent with the fourth sentence of ·§ 189(a), adopted in 1962, which dispenses with

*tunity to any interested party to intervene. . . .*

Staff of the Joint Comm. on Atomic Energy, 87th Cong., 1st Sess., Improving the Regulatory Process, Vol. II, at 49–50 (Comm. Print 1961) (emphasis added). The language of the reports, consonant with the plain meaning of section 189(a), thus indicates that the section only permits the NRC to issue a license amendment without a hearing when there has been no hearing request.[25]

Statements by Representative Holifield, Chairman of the Joint Committee on Atomic Energy, and Senator Pastore, Vice-Chairman, on the floors of their respective houses further reinforce the language in the reports. Both individuals explicitly stated that the "amendment [to section 189(a)] in no way limits the right of an interested

party to intervene and request a hearing at some later stage, nor does it affect the right of the Commission to hold a hearing on its own motion." 108 Cong.Rec. 16,548 (1962) (remarks of Rep. Holifield); *see id.* at 15,-746 (remarks of Sen. Pastore). The interpretation that the NRC and the public utilities press upon us,[26] however, would "limit[ ] the right of an interested party to intervene and request a hearing."

In sum, we are confident that *Brooks* was properly decided and that it dictates the construction that must be attached to the last sentence of section 189(a). Because the NRC's finding of "no significant hazards consideration" did not entitle the Commission to dispense with a requested hearing prior to issuance of the OTML, we hold that its failure to provide a hearing violated section 189(a) of the Atomic Energy Act.

30 days' notice and publication in the Federal Register of the Commission's *intent to issue* a license amendment without a hearing.

This ambiguity in the quoted language is not unique in the context of § 189(a). The text and legislative history of the section are replete with ambiguities and inconsistencies. *Cf.* note 20 *supra.* But there is no ambiguity in the legislative history or the text of § 189(a) with respect to the question before this court— whether a finding of "no significant hazards consideration" permits the NRC to dispense with a hearing.

**25.** Whether petitioners did in fact request a hearing was not argued by the parties. While respondent United States suggests in a footnote that "[i]t is not wholly clear that petitioners did make such a request," Memorandum of Respondent United States at 6 n.2, we are convinced that the petitioners requested a hearing. In *Brooks v. Atomic Energy Comm'n,* 476 F.2d 924, 926 (D.C.Cir.1973) (*per curiam* ), this court held that expressions of interest may be sufficient to constitute a request for a hearing. In the instant case petitioners' continued interest in—and opposition to—the actions of the NRC at TMI-2 clearly constituted a request for a hearing. Indeed, the petitioners were among the many that submitted comments in April-May 1980 to the NRC regarding the Commission's Environmental Assessment for Decontamination of the Three Mile Island Unit 2 Reactor Building Atmosphere. *See* text at notes 5–6 *supra.*

**26.** As part of their argument the NRC and the public utilities contend that the NRC, and the Atomic Energy Commission prior to the cre-

ation of the NRC, consistently interpreted the section as permitting license amendments to be issued without a hearing upon a finding of "no significant hazards consideration." *See* 10 C.F.R. § 2.105(a)(3) (1980); *id.* § 50.58(b); *id.* § 50.59(c) (1963); 45 Fed.Reg. 42,908 (1980); 45 Fed.Reg. 20,491–92 (1980); 43 Fed.Reg. 13,-928 (1978); 41 Fed.Reg. 10,482–83 (1976); 40 Fed.Reg. 18,231 (1975); 39 Fed.Reg. 10,554 (1974); 39 Fed.Reg. 1,875–76 (1974); 27 Fed. Reg. 12,184 (1962); *Consumers Power Co.,* 7 A.E.C. 297 (1974); *General Electric Co.,* 1 A.E.C. 541 (1960). Even if the history of regulations and administrative practice by the AEC and the NRC were unambiguous—which we do not think it is—deference to the agencies' interpretations would be inappropriate in this case. As we have indicated, the statute and legislative history are in our view unambiguous: a finding of "no significant hazards consideration" does not permit the NRC to dispense with a hearing. As the Supreme Court has noted, "[A]dministrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction." *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933).

It is also worth noting that because of today's decision the NRC will not be able to put into effect a regulation proposed earlier this year that would explicitly permit the NRC to dispense with hearings on license amendments upon a finding of "no significant hazards consideration." *See* 45 Fed.Reg. 20,491–92 (1980). Such a regulation would be clearly inconsistent with the congressional mandate in § 189(a).

## IV. THE NRC'S MEMORANDUM AND ORDER

The second order issued by the NRC on June 12, 1980, entitled "Memorandum and Order" (Venting Order), authorized Metropolitan Edison to vent the atmosphere of the reactor containment building. Respondents argue that section 189(a) did not require a hearing with respect to the Venting Order because the order was not a license amendment. We reject respondents' description of the order and find that section 189(a) was indeed applicable and, as a consequence, that petitioners were entitled to a hearing on the Venting Order.

Section 189(a), quoted in pertinent part in note 2 *supra*, requires that a hearing be given upon request "[i]n any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit." 42 U.S.C. § 2239(a) (1976). Respondents maintain that because the Venting Order merely lifted a prior suspension of the licensee's authority to vent, and did not authorize release of a greater amount of radioactive gas than was permitted by the original technical specifications of the operating license, it was not a license amendment. However, on the facts here, this characterization of the Venting Order appears to be nothing more than an after-the-fact rationalization, which finds no support in the record of this case.

The NRC's July 20, 1979 "Order for Modification of License" suspended Metropolitan Edison's authority to operate TMI–2 and directed the licensee to "maintain the facility in a shutdown condition in accordance with the approved operating and contingency procedures." 44 Fed.Reg. 45,271 (1979). In a second order, dated February 11, 1980, the NRC recognized that TMI–2's operating license did not permit venting as part of a cleanup operation because the license specifications pertained only to normal operation of the facility:

> [I]n the present post-accident status of the facility, the license itself does not include explicit provisions or Technical Specifications for assuring the continued maintenance of the plant in a safe, stable condition or for coping with foreseeable off-normal conditions. Moreover, certain portions of the facility's operating license relate to or govern power operation of the facility, the authority for which was suspended by the Order of July 20, 1979. *These provisions are now simply inapplicable to the facility in its present post-accident condition.*

45 Fed.Reg. 11,282 (1980) (emphasis added). The NRC concluded that "the facility's operating license should be *modified* so as to: . . . [p]rohibit venting or purging . . . until . . . approved by the NRC." *Id.* (emphasis added).

There is no indication that this order was intended or perceived as a mere suspension of the licensee's existing authority to vent. In February 1980, it appeared that adequate venting of the reactor building might not be possible under the existing license authority. Consequently, the NRC acted to modify—and thus amend—the TMI–2 license in order to regulate the plant in an "off-normal" condition and to facilitate whatever venting scheme might be determined to be necessary. By its very terms, the February 11, 1980 order was a license amendment intended to reflect TMI–2's post-accident condition. Given that the original operating license was inapplicable, the NRC could not simply rely on its terms as authority for the venting. Authority for venting—in this case the June 12 Venting Order—therefore had to come in the form of a license amendment.

The specific language of the June 12 Venting Order further corroborates our interpretation of that order as a license amendment. In the Venting Order, the NRC noted that TMI–2 was being operated according to the provisions of the February 11, 1980 order, *see* 2 Nuclear Reg.Rep. (CCH) ¶ 30,498.01, at 29,456 (1980), and the Venting Order did nothing to change that. TMI–2's operating license was not simply "unsuspended" by the Venting Order. Instead, in the words of the NRC, "[i]n the present order we give the approval contemplated by [the February 11] restriction insofar as necessary for the licensee to conduct

a purging of the TMI–2 containment." *Id.* at 29,456–57. Nowhere does the Venting Order support respondents' characterization of it as a reinstatement of some preexisting authority. Rather, the Venting Order appears as an amendment to the February 11 amendment to TMI–2's operating license. Because the June 12 Venting Order modified the February 11 order, and granted the licensee authority to do something that it otherwise could not have done under the existing license authority, the Venting Order was a license amendment within the scope of section 189(a).

Our reading of the Venting Order is also supported by Congress' intent in enacting section 189(a). By requiring a hearing upon request whenever a license is "grant[ed], suspend[ed], revok[ed], or amend[ed]," Congress apparently contemplated that interested parties would be able to intervene before any significant change in the operation of a nuclear facility. Whatever the Venting Order is called, it certainly was such a change.

As we held in Section III of this opinion, the NRC is required under section 189(a) to hold a hearing on a license amendment whenever interested parties request one.[27] Petitioners did so in this case, *see* note 25 *supra*, and the NRC therefore acted unlawfully in refusing to hold a hearing on the Venting Order.[28]

## V. CONCLUSION

Because the NRC's actions in this case are "capable of repetition, yet evading review," the issues presented by petitioners are not moot. We hold that under section 189(a) the NRC is required to hold a hearing on license amendments whenever interested parties request one. Finally, we hold that the June 12 Venting Order, which authorized the NRC to release radioactive gas from the disabled nuclear reactor, was a license amendment subject to the hearing requirements of section 189(a). Because the petitioners requested a hearing on the two June 12 license amendments, they were entitled to a hearing under section 189(a). The NRC's refusal to hold a hearing violated the petitioners' statutory rights.

27. We note that the NRC and the public utilities briefly argued that a full adjudicatory hearing was not required here. *See* Brief for Respondent Nuclear Regulatory Commission at 32–34; Brief for Intervenor-Respondents at 44–45. Because this question was not fully briefed and argued by the parties, we express no opinion on the precise nature of the hearing required by § 189(a).

28. Respondent United States argued that petitioners requested a hearing, as provided for in the OTML, and then failed to exhaust their administrative remedies by withdrawing their motion. The intended scope of that hearing and the facts surrounding the withdrawal are somewhat muddled by the record. What is clear, however, is that the offer of a hearing was made only in the OTML and not in the Venting Order. Presumably, then, petitioners would have been able to challenge only the license amendment substituting off-site dosage limits for release limits and not the actual decision to vent. Moreover, any hearing was to revolve around the issues whether the license amendment was in the public interest and whether it should be sustained. *See* 45 Fed. Reg. 41,251, 41,252 (1980). It appears from this description that petitioners would not have been permitted to raise their arguments regarding the NRC's interpretation of § 189(a), which formed the basis of this suit. Finally, the Commission specifically provided that a request for a hearing would *not* stay the effectiveness of the order. *See id.* But § 189(a) required a hearing upon request on the Venting Order before it went into effect; a hearing after the venting had been completed would not have satisfied the statute's requirement. For all these reasons, the remedy that petitioners allegedly failed to exhaust was an inadequate one and therefore need not have been pursued. *See McNeese v. Board of Educ.*, 373 U.S. 668, 674–76, 83 S.Ct. 1433, 1437–38, 10 L.Ed.2d 622 (1963); *Union Pac. R. R. Co. v. Board of County Comm'rs*, 247 U.S. 282, 38 S.Ct. 510, 62 L.Ed. 1110 (1918).