651 F.2d 792
 15 ERC 1726, 209 U.S.App.D.C. 71, 11
Envtl. L. Rep. 20,336
 Steven SHOLLY and Donald E. Hossler, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION et al., and
United States of America, Respondents,
Metropolitan Edison Company et al., Intervenors.
PEOPLE AGAINST NUCLEAR ENERGY, Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION; John Ahearne,
Victor Gilinsky, Richard T. Kennedy, Joseph M. Hendrie, and
Peter A. Bradford, in their individual capacities; and the
United States of America, Respondents,
Metropolitan Edison Company, Jersey Power & Light Company,
and Pennsylvania Electric Company, Intervenors.
In re PEOPLE AGAINST NUCLEAR ENERGY, Petitioner.
 Nos. 80-1691, 80-1783 and 80-1784.
 United States Court of Appeals
District of Columbia Circuit.
 March 4, 1981.
Certiorari Granted May 26, 1981.
See 101 S.Ct. 3004.
 
 On Suggestion for Rehearing En Banc.
 Before McGOWAN, Chief Judge, and WRIGHT, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.
 ORDER
 PER CURIAM.
 
 
 1
 The suggestion for rehearing en banc of the Public Utilities has been circulated to the full court and a majority of the court has not voted in favor thereof. On consideration of the foregoing, it is
 
 
 2
 ORDERED, by the Court, en banc, that the suggestion of the Public Utilities is denied.
 
 
 3
 TAMM, MacKINNON, ROBB and WILKEY, Circuit Judges, would grant rehearing en banc. Their statement is attached.
 
 STATEMENT ON DENIAL OF REHEARING EN BANC
 
 4
 TAMM, MacKINNON, ROBB and WILKEY, Circuit Judges:
 
 
 5
 We would grant a rehearing en banc in Sholly, et al. v. United States Nuclear Regulatory Commission, et al., No. 80-1691, --- F.2d ---- (D.C.Cir. 19 Nov. 1980) to review the startling proposition found within that opinion: that even when the Nuclear Regulatory Commission (NRC) has expressly found that a proposed amendment to an existing nuclear power plant operating license poses "no significant hazards " to human health or safety, the Nuclear Regulatory Commission is nevertheless required to provide a preamendment hearing to anyone who has expressed "continued interest in and opposition to" its actions on related matters. At ---- n.25.[1]
 
 
 6
 The panel's action raises an issue of "exceptional importance." Fed.R.App.P. 35(a). Under the rubric of statutory interpretation, the panel has made a policy decision of major consequence. The panel has read into section 189(a) of the Atomic Energy Act of 1954, 42 U.S.C. § 2239(a) (1976), as amended, the requirement that even notwithstanding a finding of "no significant hazards consideration" in a proposed license amendment, the NRC must nonetheless hold a prior hearing on the proposed amendment upon request of any interested person. By then drastically loosening the standard for what constitutes a "request" for a hearing, the panel has thrust upon the NRC the burden of holding full-fledged hearings before even the most trivial amendments to NRC operating licenses may be adopted.
 
 
 7
 We believe that the panel's inflexible blanket rule violates the Supreme Court's unanimous mandate in Vermont Yankee rejecting judicial imposition of administrative procedures upon an agency in excess of the statutory minima prescribed by Congress. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978). Furthermore, by reversing long-standing NRC policy, the panel's decision forces a major reallocation of Commission resources, which appears likely both to overwhelm the agency's hearing machinery and to divert staff attention from safety issues of greater significance. Finally, the panel decision threatens to result in the closing for as much as nine months of numerous power plants currently awaiting license amendments pending completion of hearings, when post hoc hearings might in fact be more than adequate to ventilate any health and safety issues posed by most amendments.
 
 
 8
 The license amendment in this case a temporary modification of the Three Mile Island nuclear power plant's operating license to permit post-accident release of radioactive gas from the reactor building at rates exceeding existing specifications was atypical among NRC operating license amendments.[2] Only a tiny fraction of all license amendments involve emergency matters so subject to factual dispute as the hazards attendant to venting radioactive gas into the atmosphere. The Commission acts on an average of more than 400 license amendments per year. NRC's Motion to Stay Issuance of Mandate at 3. For the seventy-one power reactors currently licensed for operation, some 800 license amendment actions are presently before the Commission. The vast bulk of these concern matters such as: changing or adding to the myriad Technical Specifications embedded in a given power plant's 400-page operating license, detailing a plant's operating conditions, modifying surveillance requirements, administrative controls, design features or the like. Affidavit of Roger S. Boyd, Former Director of the Division of Project Management, NRC Office of Nuclear Reactor Regulation at 3, attached to Intervenor-Respondents' Petition for Rehearing and Suggestion for Rehearing En Banc (Boyd Affidavit).
 
 
 9
 The NRC staff completes review of some fifty of these amendments per month; typically, it refuses to make a finding of "no significant hazards consideration" in a proposed amendment unless (1) the proposed change raises no significant new safety information of a type not previously considered in prior safety reviews, (2) the change raises no significant increase in the probability or consequences of an accident, or (3) the change offers no significant decrease in the plant's safety margin. Id. at 781 - 782. Over the past four calendar years, the NRC has published notice in the Federal Register of more than 1500 amendments to operating plant licenses which the NRC staff found to have "no significant hazards considerations." Id. at 782. The NRC has recognized that delay in issuance of license amendments would require plant shutdown if agency review is not expeditiously completed.[3] Moreover, plants already shutdown for refueling or other reasons cannot restart until such review is completed. Thus NRC, practice and regulations have long called for approval of license amendments without hearing upon a finding of no significant hazards, accompanied by post-approval publication of notice in the Federal Register.[4]
 
 
 10
 We believe that the agency's past practice complied fully with statutory mandates. Whether or not a finding of "no significant hazards consideration" has been made, no hearing is required under the applicable language of section 189(a) of the Atomic Energy Act, 42 U.S.C. § 2239(a) (1976), unless a hearing has first been specifically requested. The first sentence of section 189(a) only requires the NRC to grant a hearing on a license amendment proposal "upon the request of any person whose interest may be affected by the proceeding." (Emphasis added.) The third sentence, however, permits the NRC "in the absence of a request therefor by" such a person to issue an amendment without a hearing, "upon thirty days' notice and publication once in the Federal Register of its intent to do so." (Emphasis added.) Without mentioning hearings, the fourth sentence then specifies that the Commission may even dispense with such "thirty days' notice and publication ... upon a determination by the Commission that the amendment involves no significant hazards consideration."[5]
 
 
 11
 The Sholly panel read this language to conclude that the agency has for years in fact been operating in violation of section 189(a). The panel first argued that this court had previously held in Brooks v. Atomic Energy Comm'n, 476 F.2d 924, 926 (D.C.Cir. 1973) "that the fourth sentence (of section 189(a)) only dispenses with requirements of notice and publication," not the requirement of a hearing. 651 F.2d At 786. Furthermore, the panel then independently read the statutory language to require the same conclusion, finding that because the fourth sentence of section 189(a) refers only to thirty days' notice and publication, it "plainly demonstrates that Congress did ... intend to disentangle the two requirements of notice and hearing." At 787. The legislative history of the 1962 amendments to section 189(a), the panel concluded, demonstrates that Congress perceived the changes to section 189(a) as permitting the NRC to dispense only with notice and publication not a hearing upon a finding of "no significant hazards consideration." Id. at 788.
 
 
 12
 We believe that the panel unjustifiably relied on this court's brief per curiam opinion in Brooks to support its central proposition. We further believe that the panel's independent interpretation of the relevant language in section 189(a) ignored logic and distorted the legislative history of that section.
 
 
 13
 In Brooks two utility companies petitioned the Atomic Energy Commission to modify the provisional construction permits for two nuclear power plant units in order to extend the "latest completion date" specified in the permits. Petitioners, persons living near the proposed construction site, had earlier filed a timely request for a hearing with respect to two issues: whether the provisional construction permits should be modified to protect environmental values in accordance with NEPA and whether operating licenses for those facilities should issue. 476 F.2d at 925-26. The Commission gave petitioners notice that a hearing would be held on the second matter, "but inexplicably failed" to give notice that the proceedings would also permit discussion of the first issue: modification of the construction permits. Id. at 926 & n.6.
 
 
 14
 In ordering a hearing on the issue of extension of permit completion dates, the court made two points. Noting that the Commission's order summarily extending those dates had given "no indication whatsoever that the amendment involved no significant hazards consideration," the court stated "the Commission must surely make the required significant hazards determination, and note such determination in its order, if it intends to put forward such determination as the basis for its denial of a hearing." Id. at 926. Second, the court stated that because petitioners had made an undeniable request for a hearing on modification of permits, the Commission had erred in issuing the order without notice that the hearing scheduled to take place would also concern permit modification.
 
 
 15
 We believe Brooks to be plainly inapposite here. The Brooks court was addressing two questions not before the Sholly panel: whether the Commission could dispense with a hearing without first making a finding of no significant hazards, and whether the Commission could dispense with the notice statutorily required in the third sentence of section 189(a) when a clear request for a hearing has been made. The Brooks court plainly did not seek to lay down the broad rule which the panel here articulates: that the fourth sentence of section 189(a) requires a hearing even when the Commission has made a "no significant hazards consideration" finding. If that rule has indeed been the law of this Circuit since Brooks, it comes as a great surprise to us. At least one member of this court, addressing the proposition directly in a case decided after Brooks, stated the view that "(a)n amendment can be made without opportunity for a hearing if the AEC determines that it 'involves no significant hazards consideration.' " Union of Concerned Scientists v. AEC, 499 F.2d 1069, 1084 n.36 (D.C.Cir. 1974) (McGowan, J.). Furthermore, some thirteen NRC regulations and cases listed within the panel opinion, but summarily dismissed there, indicate that both before and after Brooks the NRC consistently interpreted section 189(a) to permit issuance of license amendments even without hearings upon a finding of "no significant hazards consideration." 651 F.2d at 789 n.26.
 
 
 16
 The panel buttresses its puzzling statutory construction with citation from a legislative history which it concedes to be "replete with ambiguities and inconsistencies." At 788 - 789 n.24. We would submit that the confusion inherent within that legislative history is alone sufficient reason why it should not have been cited selectively in support of the panel's sweeping rule. While the panel holds that the NRC's "no significant hazards consideration" finding did not entitle the Commission to dispense with a hearing prior to the license amendment. At 789, none of the legislative history cited supports the notion that Congress intended to require a prior hearing.[6] Furthermore, although the panel rejects Judge McGowan's unambiguous statement in Union of Concerned Scientists as dictum, its subsequent analysis of the legislative history of the 1962 amendments to section 189(a) makes no mention of the broad and careful statutory analysis of those amendments which lay at the heart of Judge McGowan's well-reasoned opinion.[7]
 
 
 17
 The panel's reading of the statute and legislative history becomes even more remarkable when combined with its extraordinarily broad conception of what constitutes a request for a hearing, 651 F.2d at 789 n.25. Reading Brooks to hold "that expressions of interest may be sufficient to constitute a request for a hearing," the panel then finds that "petitioners' continued interest in and opposition to the actions of the NRC at TMI-2 clearly constituted a request for a hearing."[8] By finding such facts to constitute a hearing request, the per curiam opinion has virtually read out of the statute the requirement that a hearing be requested. Yet the statutory language leaves no doubt that the NRC has no statutory duty to provide hearings on license amendments when none are requested. Furthermore, as the panel recognized, at 787 n.20, the statute expressly authorizes the NRC to dispense with thirty days' notice and publication, even if an express request for a hearing is made, so long as the NRC has made the requisite finding of "no significant hazards consideration."
 
 
 18
 We submit that the panel's interpretation of section 189(a), taken as a whole, renders it virtually impossible for the NRC faithfully to follow the explicit congressional directives found within that section. The panel has, in effect, eviscerated the congressional mandate found in both the third and fourth sentences of section 189(a). Since under the panel's standard almost any expression of interest constitutes a "request," the NRC will rarely be able confidently to dispense with a hearing on a licensing amendment, despite the fact that Congress authorized it to do so in sentence three. Since the panel recognizes that it is absurd to hold a hearing without first providing notice to interested persons,[9] the NRC will never be able safely to dispense with notice and publication even when a routine amendment undisputedly involves no significant hazards considerations, despite the fact that Congress authorized it to do so in sentence four.[10]
 
 
 19
 Finally, while we believe the question deserves further briefing, we are also troubled by the clear indications in the opinion that the panel stretched to lay down a blanket rule for all cases in a case that was arguably moot[11] and whose facts were unique and, at points, ambiguous. The parties have suggested that the panel erred not only in summarily finding that a proper request for a hearing had been made, but also in finding that such a request, even if made, had not later been withdrawn.[12] At a minimum, we would have the parties brief and argue these questions as a prerequisite to determining whether the panel's broad ruling was in fact necessary to its disposition of the case.
 
 
 20
 A number of judges and commentators have leveled criticism at this court for its continuing unwillingness to be guided by the Supreme Court's unequivocal directive in Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (reversing NRDC v. NRC, 547 F.2d 633 (D.C.Cir. 1976), and remanding to this court for a determination of adequacy of the record).[13]
 
 
 21
 In Vermont Yankee, the Supreme Court spoke to this court with one voice, making it "absolutely clear" that "(a)bsent constitutional constraints or extremely compelling circumstances the 'administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.' " 435 U.S. at 543, 98 S.Ct. at 1211 (citations omitted). The unanimous Court went on specifically to caution us against the type of procedural-imposition which has occurred here:
 
 
 22
 (I)f courts continually review agency proceedings to determine whether the agency employed procedures which were, in the court's opinion, perfectly tailored to reach what the court perceives to be the "best" or "correct" result, judicial review would be totally unpredictable. And the agencies, operating under this vague injunction to employ the "best" procedures and facing the threat of reversal if they did not, would undoubtedly adopt full adjudicatory procedures in every instance.
 
 
 23
 Id. at 546, 98 S.Ct. at 1213.
 
 
 24
 It is hard to imagine a case where the Supreme Court's concluding statement in Vermont Yankee could be more apposite than here:
 
 
 25
 Nuclear energy may some day be a cheap, safe source of power or it may not. But Congress has made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. The fundamental policy questions appropriately resolved in Congress and in the state legislatures are not subject to reexamination in the federal courts under the guise of judicial review of agency action. Time may prove wrong the decision to develop nuclear energy, but it is Congress or the States within their appropriate agencies which must eventually make that judgment. In the meantime courts should perform their appointed function.
 
 
 26
 435 U.S. at 557-58, 98 S.Ct. at 1218-19 (emphasis in original).
 
 
 27
 We submit the issues raised by Sholly demand reconsideration.
 
 
 
 [1]
 We would only have this court reconsider pages ---- - ---- of the panel opinion, --- F.2d, where this proposition is set forth
 
 
 [2]
 The peculiar circumstances under which the Sholly appeal arose made this case particularly inappropriate for judicial articulation of sweeping procedural rules. In the aftermath of the widely publicized Three Mile Island incident, the NRC had suspended the licensee's authority to operate the stricken plant, requiring that the facility be maintained in a shutdown condition. 651 F.2d at 780. Before the accident, the plant's operating license had expressly authorized periodic release of specified amounts of radioactive gas into the atmosphere as part of the plant's normal and necessary operations. Id. at 783 n.7. Because the incident had caused "dangerous concentrations of radioactive gas (to) collect ( ) within (the power plant's) reactor containment building, inhibiting cleanup and maintenance work," id. at 782, the NRC proceeded to prepare an overall study of the environmental impacts likely to result from decontamination and disposal of wastes resulting from the incident. In the meantime the Commission modified the facility's operating license to prohibit any venting or purging of the reactor building atmosphere pending explicit future approval. Id. at 782
 Almost a year after the incident, after extensive environmental assessment and after concluding that release of gas from the plant would not constitute a significant environmental impact, the Commission tentatively recommended that the reactor building atmosphere be decontaminated by venting the gas through the building's hydrogen control system. Id. at 782 - 783. On 12 June 1980 the NRC modified the plant's operating license to permit the licensee to vent the gas from the reactor building at a rate faster than allowed by existing specifications, based on its explicit finding that offsite radioactive dose limits would not be breached if the gas were vented at a rate in excess of existing release rate limits. Id. at 783 & n.8.
 The Commission further expressly found that modification of the operating license would involve "no significant hazards consideration." Id. at 783. The petitioners who later challenged the NRC's decision not to provide a hearing on that modification did not file a request for a hearing until the day before venting was to begin. Id. at 783. When venting finally began, release proceeded at first at a rate within the levels previously specified for normally operating reactors. Id. During this period at least one of the petitioners moved to suspend the venting but then subsequently withdrew their request on 8 July. On the same day as the request was withdrawn, the licensee began to vent gas at the faster rate permitted by the 12 June license amendment. Venting was completed in three days, producing offsite doses well under the expected limits; shortly thereafter the 12 June venting orders expired. The Commission has asserted, and petitioners have not controverted, that any future purging of the Three Mile Island reactor atmosphere will be at worst minor and sporadic. Id. at 784.
 
 
 [3]
 The former Director of the NRC's Division of Project Management estimates that there are about 50 license amendment applications now pending before the NRC which are likely to be classified as having "no significant hazards considerations" and which, if not approved, within the next few months, will result in the shutdown of the reactor involved. Boyd Affidavit at 5
 
 
 [4]
 Id. at 783
 
 
 [5]
 Section 189(a) of the Atomic Energy Act of 1954, 42 U.S.C. § 2239(a) (1976), as amended in 1957, Pub.L.No. 85-256, § 7, 71 Stat. 579 (1957), and in 1962, Pub.L.No. 87-615, § 2, 76 Stat. 409 (1962), reads in pertinent part as follows:
 In any proceeding, under this chapter, for the granting, suspending, revoking, or amending of any license ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application ... for a construction permit for a facility .... (T)he Commission may, in the absence of a request therefor by any person whose interest may be affected, issue ... an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for ... an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 
 
 [6]
 See, e. g., the remarks of Representative Holifield and Senator Pastore cited in the panel opinion, --- F.2d at p. ----: "(A)mendment (to section 189(a)) in no way limits the right of an interested party to intervene and request a hearing at some later stage ..." (Emphasis added)
 Even if petitioners sought to bottom their right to a prior hearing on due process grounds, rather than on the language of section 189(a), cf. at 786 - 787 n.20, discussed in note 9 infra, it is not clear why in most license amendment cases that right could not be accommodated "at a meaningful time and in a meaningful manner" by a post-amendment hearing. Cf. Mathews v. Eldridge, 424 U.S. 319, 348-49, 96 S.Ct. 893, 909-10, 47 L.Ed.2d 18 (1976). Intervenor-Respondents have suggested that in the vast majority of license amendment cases involving no significant hazards considerations, opportunity for a hearing after the amendment has issued would still allow full consideration of all issues involved without endangering plant safety or interfering with normal plant operations. See Intervenor-Respondents' Petition for Rehearing and Suggestion for Rehearing En Banc at 12. See also Boyd Affidavit at 5; note 11 infra.
 Certainly the panel could have reached its result without disrupting the Commission's prevailing practice of dispensing with prior hearings on trivial license amendments involving no significant hazards, simply by adopting the type of balancing test previously approved by this court in Union of Concerned Scientists:
 (A)dministrative action taken prior to a full hearing has always been permissible when the state's interest in acting promptly to promote the general welfare, including economic well-being, outweighs the individual's interest in having an opportunity to be heard before the state acts, perhaps in error, in ways that may cause him significant injury.
 Union of Concerned Scientists v. AEC, 499 F.2d 1069, 1081 (D.C.Cir. 1974) (emphasis added). This principle allows the decision whether or not to grant a prior hearing to be based on the facts of the individual case, rather than upon a pronouncement as broad as the one made here.
 
 
 [7]
 Ironically the panel rejects Judge McGowan's statement as dictum because "(t)he court provided no support for its far-reaching statement, nor did it even make mention of the recently decided Brooks case," a case which we believe to be inapposite. 651 F.2d at 787 n.18. Yet the panel's subsequent analysis of the legislative history of the statutory language at issue ignored both the general thrust as well as the express language of Judge McGowan's opinion
 In Union of Concerned Scientists, Judge McGowan read the Atomic Energy Act to "erect ( ) a regulatory scheme virtually unique in the degree to which broad responsibility is reposed in the administrative agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives," 499 F.2d at 1077, citing Siegel v. AEC, 400 F.2d 778, 783 (D.C.Cir. 1968). The legislative goal of the 1962 amendments, he noted, was to eliminate the kind of unnecessary procedures imposed here: "(T)he primary purpose of the 1962 amendments (was) to unburden the Commission by authorizing it to ... remov(e) the necessity of holding unnecessary and duplicative hearings." 499 F.2d at 1077 (D.C.Cir. 1974) (emphasis added).
 Furthermore, Judge McGowan expressed a marked lack of sympathy with petitioners' "fundamental misunderstanding of the AEC licensing process," suggesting that in cases like this one Congress did not intend to give the public an unequivocal right to participation:
 The role of the A(tomic) S(afety) L(icensing) B(oard) is not to compile a record; it is to review a record already compiled by the Staff and A(dvisory) C(ommittee on) R(eactor) S(afeguards), who have responsibility for the sufficiency of that record.... In the Atomic Energy Act ... (Congress) authorized the Commission, in its discretion, to determine that certain applications present no "significant hazards considerations" and to dispense with notice and publication of impending approval, excluding the public altogether.
 Id. at 1078 (emphasis added).
 
 
 [8]
 At ---- n.25. The panel finds the fact that "petitioners were among the many that submitted comments in April-May 1980" to the NRC regarding the NRC's Environmental Assessment of the plant's decontamination somehow to buttress its finding of an individual hearing request. Id
 
 
 [9]
 The panel opinion requires that even when there is an undisputed finding of no significant hazards, clearly permitting the Commission to dispense with the 30 days' notice and publication statutorily prerequisite to a hearing, that a hearing must be held nonetheless, even without notice or publication to anyone who has a continuing interest in the matter. While acknowledging that this result is "paradoxical," at 786 - 787 n.20, the panel implies that such a result might never come about because the due process clause of the Fifth Amendment or the Administrative Procedure Act may mandate that the Commission give interested persons some form of notice and publication prior to amending a license, even if the statute expressly authorizes it to dispense with thirty days' notice and publication. Id. If the panel meant to imply by this tantalizing suggestion that notice and publication were in fact constitutionally required in this case, we believe it should have made that point explicitly so that that finding could properly have been the subject of further review
 This repeated evasive tactic by some panels of this court has not gone unnoticed. See, e. g., Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 Sup.Ct.Rev. 345, 372 (criticizing this court's tendency to render decisions which are de facto unreviewable):
 (T)he most important factor leading to the de facto unreviewability of the D.C. Circuit's positions is the failure of that Court itself to facilitate review, even when the most fundamental issues are at stake. Or to put the point more critically: The pattern of dicta, alternate holdings, and confused holdings out of which the D.C. Circuit's (hybrid rulemaking principles) ... so clearly and authoritatively emerged had the effect, if not the purpose of assuring compliance below while avoiding accountability above.
 
 
 [10]
 Even if the Commission makes an uncontested finding that no significant hazards will result from a license amendment, must it nevertheless hold a hearing on that amendment for anyone who has previously expressed interest in or opposition to the NRC in related matters in the past, so long as that person continues to express some interest? Despite the fact that the Commission is statutorily authorized to dispense with thirty days' notice and publication in such a case, is it nevertheless required, sua sponte, to contact anyone who has submitted a comment about a relevant rulemaking in the preceding months to see if that person would like a hearing?
 
 
 [11]
 Although we do not specifically challenge the panel's finding of mootness, slip op. at 8-12, we express some doubt that the issue which the panel chose to resolve was truly one both "capable of repetition, yet evading review." Southern Pac. Term Corp. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) (emphasis added). The Department of Justice, the Commission, and intervenors all convincingly argued that although the question decided here whether the NRC is required to hold a hearing before issuing a license amendment based on a finding of "no significant hazards" may well recur in the future, it is unlikely to evade review. See Memorandum of Respondent United States of America at 4 ("(T)here is no reason to believe that (the NRC's) actions will characteristically be irreversible."); Brief for Respondent Nuclear Regulatory Commission at 19-25. See also Intervenor-Respondents' Petition for Rehearing and Suggestion for Rehearing En Banc at 12:
 The vast majority of operating license amendments and particularly those involving no significant hazards consideration are reversible. Changes such as shortened surveillance intervals can be lengthened; revised calculational techniques can be replaced with the prior methods.... In this respect, the amendment facilitating krypton venting from Three Mile Island Unit 2 was truly exceptional in that once released the krypton could not be reclaimed. Even in cases where "irreversible action" is involved, a subsequent hearing would still have the salutory (sic) effect of assuring thorough NRC consideration.
 
 
 [12]
 See Memorandum of Respondent United States of America at 22:
 At the ASLB hearing, ... petitioner Sholly had an opportunity to press his claim that § 189(a) entitled him to such a hearing; he could have attempted to convince the ASLB that the license amendment was invalid because the Commission had not granted a prior hearing. Instead of attempting to do so, he "formally withdrew" his motion to stop the release of radioactive krypton pending the outcome of the hearing.... He refused to go forward with the hearing. In this way the Commission was deprived of an early opportunity to correct its error.... This is a further reason for believing that the petition is moot....
 (Emphasis added.)
 
 
 [13]
 See, e. g., Scalia, Vermont Yankee: The APA, the D.C. Circuit, and the Supreme Court, 1978 Sup.Ct.Rev. 345, 345 (Vermont Yankee brought "into question the willingness of the D.C. Circuit to be guided by the Supreme Court"); Friendly, Book Review, 8 Hofstra L.Rev. 471, 481 (1980) (D.C. Circuit judges may have become "overly enthusiastic" in imposing procedural requirements on administrative agencies); Byse, Vermont Yankee and the Evolution Of Administrative Procedure: A Somewhat Different View, 91 Harv.L.Rev. 1823, 1832 (1978) (continued judicial imposition of procedural requirements on agencies reflects insensitivity to the concerns of the agency in deploying its resources to conduct its business, undue self-confidence in the assumption that the court's procedural prescription is 'best,' and lack of trust in the political process ...")