747 F.2d 139
 21 ERC 1926, 15 Envtl. L. Rep. 20,020
 The PEOPLE OF THREE MILE ISLAND acting Through THREE MILE
ISLAND ALERT, INC., Bradford, Louise and Kline,
Michael, class co-representatives, et
al., Appellants,
v.
NUCLEAR REGULATORY COMMISSIONERS Joseph M. Hendri, Richard
T. Kennedy, John Ahearne, Victor Gilinsky, Peter A.
Bradford, and Metropolitan Edison Company, General Public
Utilities, Robert Arnold, Herman Dieckamp, and John Herbein.
 No. 83-3454.
 United States Court of Appeals,
Third Circuit.
 Argued June 14, 1984.
Decided Oct. 29, 1984.
 
 Robert Hager (argued), Christic Institute, Washington, D.C., for appellants; Joanne Doroshow, Harrisburg, Pa., of counsel.
 Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., David Dart Queen, U.S. Atty., Harrisburg, Pa., Barbara L. Herwig, W. Philip Jones (argued), Attys., Civil Div., U.S. Dept. of Justice, Washington, D.C., for appellees.
 Before SEITZ and ADAMS, Circuit Judges, and STEWART, Associate Justice*.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 Appellants, the People of Three Mile Island, seek review of the district court's ruling that their suit against the Commissioners of the Nuclear Regulatory Commission (NRC) was barred by the doctrine of qualified immunity. Suit was brought against the Commissioners, Metropolitan Edison Company, General Public Utilities Company and several officials of these companies. In it, appellants alleged that the Commissioners had authorized the release of harmful radioactive gas without holding a prior hearing as required by Sec. 189(a) of the Atomic Energy Act of 1954 (AEA), 42 U.S.C. Sec. 2239(a) (1976). The district court granted the federal defendants' motion for judgment on the pleadings and the present appeal followed.[1]
 
 I.
 
 2
 This case arises in the aftermath of the widely publicized accident which occurred on March 28, 1979, at the Three Mile Island Nuclear Station, Unit 2 reactor (TMI-2). A partial meltdown of the reactor core caused the atmosphere in the TMI-2 reactor containment building to become contaminated with dangerous levels of various radioactive gases. On July 20, 1979, almost four months after the accident, the NRC issued an "Order for Modification of License" which suspended the operating license for TMI-2 and ordered Metropolitan Edison Company, the licensee,[2] "to maintain the facility in a shutdown condition." 44 Fed.Reg. 45,271 (1979). On November 21, 1979, the Commission issued a "Statement of Policy and Notice of Intent to Prepare a Programmatic Environmental Impact Statement." 44 Fed.Reg. 67,738 (1979). The NRC described this proposed statement as an "overall study of the decontamination and disposal process" and directed the Commission's staff to consider alternative methods for decontamination of TMI-2.
 
 
 3
 On February 11, 1980, the NRC issued a further order providing that
 
 
 4
 the facility's operating license should be modified so as to: ... (3) Prohibit venting or purging or other treatment of the reactor building atmosphere ... until each of these activities has been approved by the NRC, consistent with the Commission's Statement of Policy and Notice of Intent to Prepare a Programmatic Environmental Impact Statement.
 
 
 5
 45 Fed.Reg. 11,282 (1980) (footnote omitted). This order indicated that the licensee or any other person whose interest might be affected could request a hearing prior to March 21, 1980, on whether the proposed changes in the technical specifications were sufficient "to protect health and safety or to minimize danger to life and property." Id. at 11,283.
 
 
 6
 In late March of 1980, the NRC published a "Notice of the Availability of Environmental Assessment for Decontamination of the Three Mile Island Unit 2 Reactor Building Atmosphere." 45 Fed.Reg. 20,265 (1980). The notice stated that in the Assessment the NRC considered "five alternative methods for decontaminating the reactor building atmosphere and recommend[ed] that the building atmosphere be decontaminated by purging to the environment through the building's hydrogen control system." Id. The NRC concluded that venting the radioactive gas into the atmosphere would "not constitute a significant environmental impact and, accordingly, the staff does not propose to prepare a separate [environmental impact statement] on this action." Id. at 20,265-66. Public comments were permitted on the Assessment. In May of 1980, the Commission filed its "Final Environmental Assessment for Decontamination of [TMI-2] Reactor Building Atmosphere," NUREG-0662, Vol. 1 (1980).
 
 
 7
 On June 12, 1980, the NRC issued two final orders. These orders, executed without providing for a pre-implementation hearing, form the predicate of the present action. The first, the Commission's "Order for Temporary Modification of License" (OTML), modified Metropolitan Edison's operating license for TMI-2 to permit the release of radioactive gas from the reactor building at a rate faster than that permitted under the TMI-2 operating license in effect before the accident. 45 Fed.Reg. 41,251 (1980). Specifically, the Commission found that the increased rate involved "no significant hazards consideration" and stated that a request for a hearing would not stay the execution of the order.[3]
 
 
 8
 The second order, entitled "Memorandum and Order" (Venting Order), authorized the licensee to release radioactive gas from the TMI-2 reactor building into the atmosphere and provided no opportunity for a hearing at all. 2 Nuclear Reg.Rep. (CCH) p 30,498.01 (1980). The Commission directed that the two orders be effective immediately and permitted venting to begin after June 21, 1980.
 
 
 9
 On June 16, 1980, Steven Sholly and others wrote to the NRC requesting that it reconsider making the two June 12 orders effective immediately; the NRC declined to do so. Sholly then filed a petition for emergency injunctive and declaratory relief in the District of Columbia Circuit (D.C. Circuit) on June 23, 1980. Three days later the court denied the request for emergency declaratory and injunctive relief. See Sholly v. United States Nuclear Regulatory Commission, 651 F.2d 780, 783 (D.C.Cir.1980) (per curiam), reh'g denied, 651 F.2d 792 (D.C.Cir.1981), vacated, 459 U.S. 1194, 103 S.Ct. 1170, 75 L.Ed.2d 423, vacated and remanded, 706 F.2d 1229 (D.C.Cir.1983). One day before the venting was scheduled to commence, Sholly filed with the D.C. Circuit a request for a hearing on the two orders. The court referred the demand for a hearing to the Atomic Safety and Licensing Board. No hearing was held, however, and venting commenced on June 28.
 
 
 10
 Metropolitan Edison proceeded to vent the TMI-2 reactor building at a rate within the original license specifications for a normally operating reactor. On July 8, Metropolitan Edison accelerated the venting of radioactive gas to the increased rate permitted by the OTML. The licensee completed its venting of the reactor building atmosphere on July 11, 1980. As the NRC had anticipated, the off-site radiation levels did not exceed the limits set forth in the OTML.
 
 
 11
 Sholly continued to seek declaratory relief after the venting had been completed, and the D.C. Circuit ultimately ruled that the NRC had violated Sec. 189(a) of the AEA by failing to hold a hearing prior to the venting. Sholly, 651 F.2d at 789. Until amended in 1983, section 189(a) stated that:
 
 
 12
 In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.... In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 
 
 13
 42 U.S.C. Sec. 2239(a) (1976).
 
 
 14
 The D.C. Circuit held that Sec. 189(a) required the Commission to hold a hearing on license amendments whenever interested parties request one. Moreover, it determined that both June 12 orders were license amendments.[4] Because the Commission had refused to hold the requested hearings, the court concluded that the NRC had violated the petitioners' statutory rights.
 
 
 15
 Subsequently, the NRC petitioned the D.C. Circuit for rehearing. Four judges dissented from the en banc denial of the request. Sholly, 651 F.2d 792 (D.C.Cir.1981) (dissent from denial of rehearing). The dissenting judges argued that the court had misconstrued the statute when it held that a pre-amendment hearing was required even if the Commission made a no significant hazards determination.
 
 
 16
 Thereafter, the NRC petitioned the Supreme Court to grant certiorari on the issue whether the Commission was required to hold a hearing on an operating license amendment notwithstanding the Commission's finding that the amendment involved no significant hazards consideration. The Court granted certiorari on this limited question. Sholly, 451 U.S. 1016, 101 S.Ct. 3004, 69 L.Ed.2d 387 (1981). At the same time, the NRC was also attempting to gain its desired goal--permission to forego hearing requests in certain situations--by legislative action. The Commission urged Congress to amend Sec. 189(a) of the AEA to authorize the NRC to waive the hearing requirement whenever the amendment involved no significant hazards consideration. See Authorizing Appropriations to the Nuclear Regulatory Commission, Report to Accompany S. 1207, S.Rep. No. 113, 97th Cong., 1st Sess. 14-16 (1981); Authorizing Appropriations for the Nuclear Regulatory Commission, Conference Report to Accompany H.R. 2330, H.R.Rep. No. 884, 97th Cong., 2d Sess. 36-39 (1982), U.S.Code Cong. & Admin.News 1982, pp. 3592, 3606-3609. On January 3, 1983, Congress enacted an amendment to Sec. 189 which allowed the NRC to issue and make effective immediately any amendments to an operating license, upon a no significant hazards determination by the Commission, notwithstanding the pendency before the Commission of any requests for a hearing by interested parties. In such a case, Congress approved post-implementation hearings.[5] In light of this amendment, the Supreme Court vacated the judgment of the court of appeals and remanded for a consideration whether the case was moot. 459 U.S. 1194, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983). In April, 1983, the D.C. Circuit vacated its prior decision, and remanded the case to the NRC. 706 F.2d 1229 (D.C.Cir.1983).
 
 
 17
 The present suit, filed in June, 1982, is a Bivens -type[6] constitutional tort claim, in the form of a class action, seeking money damages from the Commissioners. Appellants allege that they were injured as a result of the Commissioners' authorization of the release of radioactive gas into the atmosphere from the crippled TMI-2 reactor building without holding the hearing required by Sec. 189(a). Adopting the magistrate's report and recommendation in its entirety, the district court granted defendants' motion to dismiss. It ruled that the Commissioners were entitled to qualified immunity as prescribed by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Appellants appeal the district court's dismissal and request that we remand the case for a disposition on the merits. For the following reasons, we affirm the district court's dismissal on the ground of qualified immunity.[7]
 
 II.
 
 18
 Executive officials performing discretionary, as opposed to ministerial, functions are entitled to qualified immunity from suit.[8] In granting such officials a qualified immunity the Supreme Court has attempted to strike what it has described as "the best attainable accommodation of competing values." Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982).
 
 
 19
 On the one hand, the Court expressed solicitude for the need to protect government officers whose duties often require them to exercise discretion. Moreover, the Court has stated that the public interest is served by "encouraging the vigorous exercise of official authority" and by not discouraging qualified men and women from entering public service because of the fear of substantial personal liability. See Harlow, 457 U.S. at 814, 102 S.Ct. at 2736; Butz v. Economou, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978); Scheuer v. Rhodes, 416 U.S. 232, 240-42, 94 S.Ct. 1683, 1688-89, 40 L.Ed.2d 90 (1974).
 
 
 20
 On the other hand, the Court has recognized that an action for damages "may offer the only realistic avenue for vindication of constitutional guarantees." Harlow, 457 U.S. at 814, 102 S.Ct. at 2736; see Bivens, 403 U.S. at 410, 91 S.Ct. at 2012 ("For people in Bivens' shoes, it is damages or nothing."). Thus the specter of a damage suit can function as a deterrent against abuse of office as well as provide the injured party with an opportunity for recompense. See Butz v. Economou, 438 U.S. at 506, 98 S.Ct. at 2910.
 
 
 21
 In Harlow, the Supreme Court reformulated the standard for determining qualified immunity.[9] Prior to Harlow, the qualified immunity test had two prongs: one objective and one subjective. See, e.g., Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Under the objective prong, an official was not shielded from liability if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [plaintiffs]." Id. An official would be denied immunity under the subjective prong if "he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." Id. Because of its concern that the subjective, or good faith component of qualified immunity would entail wide-ranging discovery into the official's motivation, the Court in Harlow eliminated the subjective prong. 457 U.S. at 816-19, 102 S.Ct. at 2738-39. Instead, it fashioned a new test for qualified immunity as follows: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818, 102 S.Ct. at 2738 (emphasis added). No other inquiry is relevant. See Davis v. Scherer, --- U.S. ----, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).
 
 
 22
 In a footnote following the crafting of the new test, the Court declared that it "need not define here the circumstances under which 'the state of the law' should be 'evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court.' " Id., 457 U.S. at 818 n. 32, 102 S.Ct. at 2739 n. 32 (quoting Procunier v. Navarette, 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978)). Thus, lower courts have been given the task of creating a formula for identifying what constitutes "clearly established" law.[10] See Comment, Harlow v. Fitzgerald: The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983, 132 U.Pa.L.Rev. 901 (1984).
 
 
 23
 The "clearly established" requirement poses at least two ambiguities. First, as the Supreme Court acknowledged, lower courts are not informed whether two conflicting opinions from different district courts, or even a split decision in the court of appeals, makes the law sufficiently unclear to mandate the granting of immunity.[11]
 
 
 24
 The second, and more difficult, uncertainty in employing the "clearly established" standard involves the determination of how close a factual correspondence is required between applicable precedents and the case at issue. The Court in Harlow suggested that there must be some factual correlation, because an official may not be required "to anticipate subsequent legal developments" nor know that "the law forbade conduct not previously identified as unlawful." Harlow, 457 U.S. at 818, 102 S.Ct. at 2738. Some courts have required a relatively strict factual identity. See, e.g., National Black Police Ass'n v. Velde, 712 F.2d 569, 576 (D.C.Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2180, 80 L.Ed.2d 562 (1984); Saldana v. Garza, 684 F.2d 1159, 1165 (5th Cir.1982), cert. denied, 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983); Calloway v. Fauver, 544 F.Supp. 584 (D.N.J.1982); Comment, supra note 11, at 923-26. Other courts have insisted that officials know and apply general legal principles in appropriate factual situations. Although officials need not "predic[t] the future course of constitutional law," Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), they are required to relate established law to analogous factual settings. See, e.g., Williams v. Bennett, 689 F.2d 1370, 1381-82 (11th Cir.1982) (legal principles set forth in previous cases, that certain Alabama prison conditions constitute cruel and unusual punishment, preclude immunity in prisoner's suit), cert. denied, --- U.S. ----, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983); see also, Comment, supra note 11, at 927-30.
 
 
 25
 We adopt the second approach--requiring some but not precise factual correspondence and demanding that officials apply general, well developed legal principles. Such a formulation of the law better strikes the balance between the competing interests that the Supreme Court identified when it fashioned the contours of executive immunity. While we cannot expect executive officials to anticipate the evolution of constitutional law, neither can we be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement. Insisting on a precise factual correspondence between the conduct at issue and reported case law is tantamount to such a license. See Hixon v. Durbin, 560 F.Supp. 654, 665 (E.D.Pa.1983). Moreover, requiring officials to consider the legal implications of their actions should have a salutary effect.
 
 III.
 
 26
 Under Supreme Court decisions, the Commissioners, as executive officials, are entitled to qualified immunity for their discretionary acts.[12] According to the standard set forth in Harlow, we must grant defendants qualified immunity unless they have violated a clearly established statutory or constitutional right.
 
 
 27
 Appellants allege that the Commissioners transgressed Sec. 189(a) of the AEA by refusing to hold a hearing, as requested, before the implementation of the June 12 orders. When the orders were issued in 1980, Sec. 189(a) stated that "[i]n any proceeding ... for the granting, suspending, revoking, or amending of any license ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." 42 U.S.C. Sec. 2239(a) (1976). Appellants assert that this provision clearly required the Commissioners to conduct a hearing prior to implementing the June 12 orders. In order to determine whether this suit may proceed to a decision on the merits or whether it should be dismissed, we must ascertain whether the Commissioners' refusal to hold a hearing in connection with the venting violated clearly established law.
 
 A.
 
 28
 The first order that the Commission issued on June 12, 1980, the Order for Temporary Modification of License (OTML), authorized the venting of radioactive gas from the TMI-2 reactor containment building at a rate faster than that permitted by the original operating license. 45 Fed.Reg. 41,251 (1980). The OTML modified the technical specifications of the original license, and as such the Commissioners admit that the OTML constitutes a license amendment within the meaning of Sec. 189(a). Nevertheless, defendants argue that although the OTML is subject to the strictures of Sec. 189(a), there was no clearly established right to a hearing because of their determination that the OTML involved no significant hazards consideration. The confusion in the law arises, defendants maintain, from this finding and from the third and fourth sentences of the statute which were added in a 1962 amendment. These sentences declare that
 
 
 29
 In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 
 
 30
 42 U.S.C. Sec. 2239(a) (1976), as amended in 1962, Pub.L. No. 87-615, Sec. 2, 76 Stat. 409 (1962).
 
 
 31
 Although the statute explicitly dispenses only with notice upon a no significant hazards determination, the Commissioners urge that the hearing and notice requirements are inextricably intertwined. Moreover, they assert that reading the statute literally would lead to the paradoxical situation that upon a determination of no significant hazards, a party would still be permitted to demand a hearing, even though no notice need be given to alert the party to the impending amendment. Also, the third sentence of the statute permits the NRC to dispense with a hearing, if none is requested. Thus the Commissioners argue that the statute is not sufficiently clear to predicate civil liability under the Harlow standard.
 
 
 32
 The legislative history does not elucidate Congress' intent. Although there are some indications that Congress meant to treat hearing and notice rights separately,[13] there is no clear indication that Congress intended to require a hearing prior to a license amendment when the Commission determined that the amendment involved no significant hazards consideration. For example, statements by Representative Holifield, Chairman of the Joint Committee on Atomic Energy, and Senator Pastore, Vice-Chairman, suggest that post-amendment hearings were considered a sufficient safeguard. Both legislators asserted that the "amendment [to section 189(a) ] in no way limits the right of an interested party to intervene and request a hearing at some later date, nor does it affect the right of the Commission to hold a hearing on its own motion." 108 Cong.Rec. 16,548 (1962) (remarks of Rep. Holifield) (emphasis added); see id. at 15,746 (remarks of Sen. Pastore). Finally, we note that when confronted with the question of what type of hearing, if any, should be required in cases involving no significant hazards consideration, Congress amended the statute to allow post-amendment hearings. Pub.L. No. 97-415, 96 Stat. 2067 (codified as amended at 42 U.S.C. Sec. 2239(a) (1982)).[14]
 
 
 33
 The case law extant in 1980 did not clearly require a hearing on license amendments involving no significant hazards consideration. In 1973, the D.C. Circuit, in a per curiam opinion, held that it was necessary for the Atomic Energy Commission, the predecessor of the NRC, to give interested parties a hearing, if requested, on a license amendment. Brooks v. Atomic Energy Commission, 476 F.2d 924 (D.C.Cir.1973) (per curiam). The court in Brooks referred to the Commission's interpretation of the statute as not requiring a hearing upon a no significant hazards determination, but did not explicitly affirm or reject this contention. Rather, the court held that the Commission may not deny a hearing request, or decline to publish a notice of an impending amendment, in the absence of a no significant hazards consideration finding. Id. at 927-28.
 
 
 34
 Fifteen months after Brooks, a different panel of the same court decided Union of Concerned Scientists v. Atomic Energy Commission, 499 F.2d 1069 (D.C.Cir.1974). In a footnote, the court adopted the Commission's interpretation of the statute, stating that "a [license] amendment can be made without opportunity for a hearing if the AEC determines that it 'involves no significant hazards consideration.' 42 U.S.C. Sec. 2239(a)." Id. at 1084 n. 36. Finally, in thirteen NRC regulations and decisions from 1960 to 1980, the Commission has interpreted Sec. 189(a) as permitting the issuance of a license amendment without a hearing upon a finding of no significant hazards consideration. See Sholly, 651 F.2d at 789 n. 26.
 
 
 35
 In insisting that the requirement to conduct a hearing was clearly established at the time in question, appellants rely primarily on the holding and reasoning of Sholly, 651 F.2d at 780. In Sholly the court rejected the NRC's interpretation of the statute and ruled that the Commission could not refuse an interested party's request to hold a hearing even if there was a no significant hazards finding. Id. at 789. We need not determine whether Sholly was correctly decided, for our task is not to ascertain whether the NRC, in fact, had a duty to conduct a hearing;[15] rather we must limit our inquiry to whether such a duty was clearly established in 1980. Because of our narrow focus, the decision in Sholly, rendered two years after the OTML was issued, is not dispositive. Moreover, the Supreme Court granted certiorari to review the court of appeals' determination, but then vacated the appellate court's decision in light of the 1983 amendment to Sec. 189(a). 459 U.S. 1194, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983). Thus, the holding of the court of appeals has no precedential value. In any event, Sholly stands only for the proposition that a hearing should have been held, not that the right to a hearing was clearly established so that the Commissioners should be held civilly liable for failing to hold a hearing.
 
 
 36
 While the holding in Sholly on the merits is not binding, the reasoning of the D.C. Circuit may be relevant if it indicates that the law was clear. The court relied heavily on its earlier decision in Brooks and on legislative history. Our own reading of Brooks in conjunction with Union of Concerned Scientists as well as the legislative history of the applicable statute, suggests that the right to a hearing was not clearly established. We also note that four judges of the D.C. Circuit dissented from the en banc denial of the NRC's petition for rehearing, and in their statement explaining their position, characterized the majority's holding that a hearing was required as a "startling proposition." Sholly, 651 F.2d at 792 (dissent from denial of rehearing in banc). Furthermore, the dissenting judges argued that the panel's decision reversed long-standing NRC policy which "complied fully with statutory mandates." Id. at 794.
 
 
 37
 The decision by the district judge in the case at hand that a right to a hearing on the OTML was not clearly established within the meaning of Harlow is not erroneous. The statute on its face and the legislative history did not clearly mandate a hearing in cases involving no significant hazards. Moreover, the D.C. Circuit's decision in Union of Concerned Scientists and the statement of the four dissenting judges in Sholly, coupled with twenty years of agency practice all demonstrate that the hearing requirement was unclear. The cumulative effect of all these factors leads us to conclude that the Commissioners are entitled to qualified immunity for failing to hold a hearing on the OTML.
 
 B.
 
 38
 The NRC's second order of June 12, 1980, was the Memorandum and Order (Venting Order) which authorized Metropolitan Edison to vent the TMI-2 reactor building. 2 Nuclear Reg.Rep. (CCH) p 30,498.01 (1980). The Commissioners did not determine that the Venting Order involved no significant hazards consideration and thus the reasoning of Part IIIA is not applicable to the second order. The Commissioners cannot deny that absent such a finding they are required to hold a hearing for any "granting, suspending, revoking or amending of any license." Sec. 42 U.S.C. Sec. 2239(a). The NRC contends, however, that Sec. 189(a) is simply inapplicable, or at least its applicability is not clearly established, because the Venting Order does not constitute a license amendment within the meaning of Sec. 189(a). Appellants argue that the Venting Order is a license amendment; the Commissioners assert that the Venting Order merely lifted the prior suspension of the licensee's authority to vent, and because it did not authorize the release of a greater amount of radioactive gas than was initially permitted, it does not constitute a license amendment.
 
 
 39
 Appellants once more rely on Sholly which held that the Venting Order did constitute a license amendment and that therefore the Commissioners violated Sec. 189(a) by failing to hold the requested hearing. Sholly, 651 F.2d at 790-91. Again we stress that Sholly's holding is not determinative because Sholly decided only the merits of the claim, not whether the Commissioners reasonably should have known that the order was a license amendment. Although the D.C. Circuit belittled the NRC's characterization of the order as "nothing more than an after-the-fact rationalization, which finds no support in the record of this case," id. at 790,[16] it did not determine that the law was clearly established so as to defeat qualified immunity.[17]
 
 
 40
 As stated in Part II, supra, we do not insist on an exact factual match when a general legal proposition is clearly established. But neither do we require government officials to predict the course of the law. At the time of the NRC's decision, there were no precedents on point. Moreover, the definition of a license amendment had not been subject to judicial scrutiny, and thus could not be considered a well developed legal principle.
 
 
 41
 In the absence of any guidance on the proper classification of the Venting Order, the Commissioners demonstrated that the agency's past practice was not to treat orders lifting license suspensions as amendments within the ambit of Sec. 189(a). On July 20, 1979, the NRC suspended Metropolitan Edison's authority to operate TMI-2 and directed the licensee to "maintain the facility in a shutdown condition." 44 Fed.Reg. 45,271 (1979). In a subsequent order, dated February 11, 1980, the NRC determined that "the facility's operating license should be modified so as to ... [p]rohibit venting or purging ... until ... approved by the NRC." 45 Fed.Reg. 11,282 (1980). The Venting Order noted that TMI-2 was operating pursuant to the provisions of the February 11 order and stated that "in the [Venting O]rder we give the approval contemplated by [the February 11] restriction insofar as necessary for the licensee to conduct a purging of the TMI-2 containment." 2 Nuc.Reg.Rep. p 30,498.01 at 29,456-57. Arguably only the February 11 order amended the operating license, and therefore the Commissioners were not unreasonable in viewing the Venting Order as the recission of a license suspension.
 
 
 42
 This case is a far cry from situations involving a clearly established and well litigated general proposition in which the case at hand merely presents a new factual wrinkle. The NRC had not previously encountered any remotely parallel situations involving crippled nuclear reactors. Moreover, the definition of a license amendment was not previously subject to judicial scrutiny, agency practice was not to classify such orders as license amendments, and on its face, the statute did not necessarily include such orders. Accordingly, under the circumstances, the Commissioners cannot be held liable for failing to grant appellants' request for a hearing on the Venting Order.
 
 IV.
 
 43
 The judgment of the district court will be affirmed.
 
 
 
 *
 Honorable Potter Stewart, Associate Justice (Retired) of the Supreme Court of the United States, sitting by designation
 
 
 [1]
 The district court also granted the private defendants' motion for judgment on the pleadings. Appellants have not appealed that ruling
 
 
 [2]
 Metropolitan Edison Company, Jersey Central Power and Light Company, and Pennsylvania Electric Company jointly hold the operating license for TMI. These companies will be collectively referred to as licensee or Metropolitan Edison
 
 
 [3]
 One basis for the NRC's no significant hazards determination was its opinion that off-site dose limits would not be surpassed, although the release rate limits would be exceeded. The Commission was primarily concerned with the effect of venting on human health and believed that satisfactory off-site dose limits--a more direct measure of actual exposure than release rate limits--would be sufficient to safeguard human health
 
 
 [4]
 The Commission does not now deny that the OTML is a license amendment within the meaning of the statute; the characterization of the Venting Order is in dispute. See infra Part IIIB
 
 
 [5]
 As amended, Sec. 189(a) now provides that
 (a)(1) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit ... the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.... In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 (2)(A) The Commission may issue and make immediately effective any amendment to an operating license, upon a determination by the Commission that such amendment involves no significant hazards consideration, notwithstanding the pendency before the Commission of a request for a hearing from any person. Such amendment may be issued and made immediately effective in advance of the holding and completion of any required hearing. In determining under this section whether such amendment involves no significant hazards consideration, the Commission shall consult with the State in which the facility involved is located. In all other respects such amendment shall meet the requirements of this chapter.
 Pub.L. No. 97-415, 96 Stat. 2067, Sec. 12(a), 42 U.S.C. Sec. 2239(a) (1983).
 
 
 [6]
 Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)
 
 
 [7]
 Because we determine that the Commissioners are entitled to qualified immunity under the circumstances present here, we need not reach the Commissioners' alternative contention that they should be granted absolute immunity because their actions were judicial in nature
 
 
 [8]
 The Supreme Court has determined that executive officials are to be granted to qualified, rather than absolute immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 806-09, 102 S.Ct. 2727, 2732-33, 73 L.Ed.2d 396 (1982); Butz v. Economou, 438 U.S. 478, 506-07, 98 S.Ct. 2894, 2910-11, 57 L.Ed.2d 895 (1978)
 
 
 [9]
 Immunity is an affirmative defense which must be pleaded by an official named as a defendant in a law suit. See Harlow, 457 U.S. at 815, 102 S.Ct. at 2737; Gomez v. Toledo, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Commissioners have pleaded this defense
 The Court has held that qualified immunity is coextensive for suits brought against state officials under 42 U.S.C. Sec. 1983 (1982), and for suits brought directly under the Constitution against federal officials. See Butz v. Economou, 438 U.S. at 504, 98 S.Ct. at 2909.
 
 
 [10]
 The Supreme Court applied the "clearly established" language narrowly in Davis v. Scherer, --- U.S. ----, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)
 
 
 [11]
 For examples of the difficulty courts have had in following Harlow, see Comment, Harlow v. Fitzgerald: The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983, 132 U.Pa.L.Rev. 901, 919 (1984)
 
 
 [12]
 Appellants have not argued that the Commissioners' decisions not to hold hearings on the two June 12 orders were ministerial rather than discretionary acts
 
 
 [13]
 The 1962 Report of the Joint Committee on Atomic Energy states:
 In the absence of a request for a hearing, issuance of an amendment to a construction permit, or issuance of an operating license, or an amendment to an operating license, would be possible without formal proceedings, but on the public record. It will also be possible for the Commission to dispense with the 30-day notice requirement where the application presents no "significant hazards consideration."
 * * *
 Finally, it is expected that the authority given AEC to dispense with notice and publication would be exercised with great care and only in those instances where the application presented no significant hazards consideration.
 S.Rep. No. 1677, 87th Cong., 2d Sess. 8 (1962), reprinted in 1962 U.S.Code Cong. & Admin.News 2207, 2214-15; H.R.Rep. No. 1966, 87th Cong., 2d Sess. 8 (1962); see also Sholly, 651 F.2d at 787-89.
 
 
 [14]
 The fact that Congress subsequently amended the statute, by itself, can be interpreted two ways: Congress was merely clarifying its original intent; or upon reflection, Congress decided to change the hearing requirements. The legislative history to the amendment does not conclusively substantiate either of these interpretations. See 1982 U.S.Code Cong. & Admin.News 3598-3600
 
 
 [15]
 Because the statute was amended in 1983, the question whether the 1980 version of Sec. 189(a) required a hearing is academic--other than for purposes of this suit. However, if there were some continuing need to interpret the statute, we might have the power to do so. See infra note 17
 
 
 [16]
 The dissenting judges in Sholly did not address the court's holding regarding the Venting Order
 
 
 [17]
 We are aware that our limited holding may lead to an anomalous result: by declining to reach the merits, there will not be created an undisputed duty to hold a hearing on similar NRC decisions in the future. Courts have the power to remedy this situation in an appropriate case. See United States v. Leon, --- U.S. ----, ----, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984); Johnson v. Brejle, 701 F.2d 1201 (7th Cir.1983); Calloway v. Fauver, 544 F.Supp. 584 (D.N.J.1982). This Court has recently recognized the close connection between a claim of qualified immunity and the underlying substantive suit. See Deary v. Three Un-Named Police Officers, 746 F.2d 185 (3d Cir.1984)